125 P.3d 508

**SURVIVORS OF Roy W.C. YOUNG, Claimant–Appellant,**

v.

**ISLAND FEELING, INC., and TIG P & C Insurance Company, Employer/Insurance Carrier–Appellee,**

and

**Special Compensation Fund, Appellee.**

**No. 25661.**

Intermediate Court of Appeals of Hawai'i.

March 18, 2005.

Herbert R. Takahashi and Rebecca L. Covert (Takahashi, Masui & Vasconcellos), on the briefs, for Claimant–Appellant.

Robin R. Horner, on the briefs, for Employer/Insurance Carrier–Appellee.

Frances E.H. Lum and Robyn M. Kuwabe, Deputy Attorneys General, State of Hawai'i, on the briefs, for Appellee Special Compensation Fund.

BURNS, C.J., LIM and NAKAMURA, JJ.

Opinion of the Court by LIM, J.

In this case involving workers' compensation death benefits, the wife and son (the survivors) of the employee, the late Roy W.C. Young (Young), appeal the February 12, 2003 decision and order of the Labor and Industrial Relations Appeals Board (the Board).

The survivors contend the Board was wrong as a matter of law in using the date-of-injury maximum weekly benefit rate (MWBR) to calculate their death benefits. They argue that a dependent's claim for death benefits is "separate" from the workers' compensation claim of the injured employee; as such, death benefits should be based on the MWBR in effect on the date of death, not the date of injury.

The survivors also contend the Board abused its discretion in denying their application for correction of the Board's August 3, 2001 pretrial order. They argue that the omission of the words "and weekly benefits" from the rendition of one of the issues in the pretrial order constituted a mere "clerical mistake" that the Board should have corrected.

We disagree with both contentions, and affirm.

## I. Background.

On July 7, 1988, Young suffered a ruptured cerebral aneurysm in the course of his employment.[1] Young lapsed into a semi-comatose condition from which he never recovered. At the time of his injury, Young was married to Shirlyn Young (Shirlyn), and together they had one child, a son named Bronson.

On November 16, 1988, Shirlyn, on behalf of her husband, filed for workers' compensation benefits pursuant to Hawaii Revised Statutes (HRS) ch. 386 (1993 & Supp.2004). In a decision dated December 5, 1991, the Director of the Department of Labor and Industrial Relations (the Director) ordered Young's employer, Island Feeling, Inc., through its insurance carrier, Transamerica Insurance Company[2] (collectively, the Employer), to pay Young temporary total disability benefits (TTD benefits) on an open-ended basis. HRS § 386–31(b) (1993) provides for TTD benefits and states, in relevant part:

(b) Temporary total disability. Where a work injury causes total disability not determined to be permanent in character, the employer, for the duration of the disability, but not including the first three calendar days thereof, shall pay the injured employee *a weekly benefit at the rate of sixty-six and two-thirds per cent of the employee's average weekly wages, subject to the limitations on weekly benefit rates prescribed in subsection (a),* or if the employee's average weekly wages are less than the minimum weekly benefit rate prescribed in subsection (a), at the rate of one hundred per cent of the employee's average weekly ages.

(Emphasis supplied.) The limitation referred to effectively capped weekly TTD benefits, "[b]eginning January 1, 1975, and during each succeeding twelve-month period thereafter," at an amount "not more than the state average weekly wage last determined by the director[.]" HRS § 386–31(a) (1993). Young's average weekly wage at the time of

1. Forty-four years old at the time of his injury, Roy W.C. Young (Young) was the founder and president of Island Feeling, Inc., a Hawai'i-based clothing manufacturing company.

2. TIG P & C Insurance Company is the successor to Transamerica Insurance Company and is designated the appellee herein.

his injury was $644.23. Sixty-six and two-thirds per cent (0.6667) of this amount is $429.51. However, the State average weekly wage in 1988 was $334.00. Because $429.51 exceeded this amount, the Director limited Young's TTD benefits to the $334.00 weekly rate, which became Young's MWBR.

On May 11, 1995, the Director held a follow-up hearing to evaluate updated medical reports regarding Young's physical condition, and to make findings accordingly. In a decision dated June 26, 1995, the Director concluded that Young was permanently and totally disabled and awarded Young permanent total disability benefits (PTD benefits) starting January 10, 1991.[3] HRS § 386–31(a) provides for PTD benefits and states, in pertinent part:

(a) Permanent total disability. Where a work injury causes permanent total disability the employer shall pay the injured employee a *weekly benefit equal to sixty-six and two-thirds per cent of the employee's average weekly wages, subject to the following limitation:*

*Beginning January 1, 1975, and during each succeeding twelve-month period thereafter, not more than the state average weekly wage last determined by the director,* rounded to the nearest dollar, nor less than $38 or twenty-five per cent of the foregoing maximum amount, rounded to the nearest dollar, whichever is higher.

(Emphases supplied.) Young's PTD benefits were based on the previously-determined, date-of-injury MWBR of $334.00 per week.[4]

On May 15, 2000, Young died of complications from his work-related injury.[5] On June 23, 2000, the survivors filed a claim for death benefits as Young's dependents. HRS § 386–41 (1993 & Supp.2004) provides for dependents' death benefits, which include funeral and burial allowances and a weekly

benefit. HRS §§ 386–41(a), –41(b) and –41(c) provide, in pertinent part:

(a) Funeral and burial allowance. Where a work injury causes death, the employer shall pay funeral expenses *not to exceed ten times the maximum weekly benefit rate* to the mortician and burial expenses *not to exceed five times the maximum weekly benefit rate* . . . .

(b) Weekly benefits for dependents. In addition, the employer shall pay weekly benefits to the deceased's dependents at the percentages of the deceased's average weekly wages specified below, *taking into account not more than the maximum weekly benefit rate prescribed in section 386–31 divided by .6667* and not less than the minimum prescribed in the section divided by .6667.

. . . .

To the dependent widow, widower, or reciprocal beneficiary, if there are one or more dependent children of the deceased, sixty-six and two-thirds per cent. . . .

. . . .

(c) Maximum weekly amounts. The sum of all weekly benefits payable to the dependents of the deceased employee shall not exceed sixty-six and two-thirds per cent of the employee's average weekly wages, computed by observing the limits specified in subsection (b), if necessary, the individual benefits shall be proportionally reduced.

(Emphases supplied.) However, HRS § 386–43(b) (Supp.2004) limits the total amount dependents may receive in weekly benefits:

"(b) The aggregate weekly benefits payable on account of any one death *shall not exceed the product of 312 times the effec-*

---

**3.** On January 9, 1991, Young was transferred from Queen's Hospital, where he was initially hospitalized, to Le'ahi Hospital for long-term care. Young's permanent total disability benefits began the day after his transfer to the long-term care facility.

**4.** Young was also awarded a weekly benefit adjustment of $103.00 and the maximum amount for disfigurement, $15,000.00.

**5.** By the time of his death, a total of $1,562,208.61 had been paid on Young's behalf for medical care, temporary total disability benefits, permanent total disability benefits, benefit adjustments, and disfigurement.

*tive maximum weekly benefit rate pre-scribed in section 386–31[.]"*

(Emphasis added.)

On April 19, 2001, the Director held a hearing to determine death benefits for the survivors. Their funeral and burial expenses totaled $14,262.07, of which $6,816.79 went for the funeral and $7,445.28 went for the burial. In a decision dated May 14, 2001, the Director calculated the death benefits based on the date-of-injury MWBR of $334.00. The survivors were awarded a total of $5,010.00 for funeral and burial expenses— $3,340.00 for funeral expenses ($334.00 × 10 = $3,340.00) and $1,670.00 for burial expenses ($334.00 × 5 = $1,670.00). HRS § 386–41(a). The Director also awarded aggregate weekly benefits of $104,208.00 ($334.00 per week × 312 weeks). HRS § 386–43(b). On May 23, 2001, the Director issued an amended, supplemental decision that split the death benefit payments equally between the Employer and the Special Compensation Fund, pursuant to their compromise agreement.

The survivors appealed the Director's May 14 and May 23, 2001 decisions to the Board. Reasoning that their claim arose on the date of Young's death—May 15, 2000, when the State average weekly wage was $529.00—the survivors contended the Director should have calculated their death benefits based on the date-of-death MWBR, which they asserted was $429.51.[6]

On July 30, 2001, the survivors filed a pretrial statement identifying several issues on appeal to the Board, including,

(1) Whether the rate of compensation used to calculate funeral and burial allowance *and weekly benefits,* pursuant to HRS § 386–41, is based on the rate for the year in which the injured employee died?

(Emphasis supplied.) A pretrial conference was held on August 2, 2001, in which all parties were represented by counsel. There was apparently no discussion among the parties to the pretrial conference regarding the

listing of weekly benefits as an issue for trial. On August 3, 2001, the Board issued its pretrial order setting the issues for trial:

a.  Whether the rate of compensation used to calculate funeral and burial expenses is based on the rate for the year the injured employee died.

b.  Whether the aggregate weekly benefits payable for death benefits, pursuant to Section 386–43, H.R.S., is based on the rate of compensation for the year the injured employee died.

c.  Whether the liability apportionment between Employer and the SPECIAL COMPENSATION FUND for payment of death benefits, pursuant to Section 386–41 and 386–43, H.R.S., is affected by the ruling on issues 1 and 2 above.

(Capitalization in the original.) Although the omission of the words "and weekly benefits" from issue a. is rather salient, there is no indication in the record that the survivors challenged the Board's pretrial order before trial. At the start of the October 29, 2002 trial, the Board's chairman read the issues on appeal to the parties, verbatim from the pretrial order. The survivors made no effort to correct the omission. They did, however, inform the Board that they had withdrawn issue c.

On November 14, 2002, the survivors filed an application for correction of the omission. They claimed that the omission was a mere "clerical mistake" remediable under Hawaii Administrative Rules (HAR) § 12–47–54 (February 24, 1994):

Clerical mistakes in decisions, orders, or other parts of the record and errors therein arising from oversight or omission may be corrected by the board at any time of its own initiative or upon the application of any party. During the pendency of a judicial appeal, the mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the

---

**6.** If we accept the Young survivors' assertion that a $429.51 date-of-death MWBR should have been used in lieu of the $334.00 date-of-injury MWBR in calculating their death benefits (the funeral and burial allowance and the aggregate weekly benefits), the total amount in dispute in this appeal comes to $31,231.77 over time.

appeal is pending, may be so corrected with leave of the appellate court.

On November 27, 2002, the Board denied the application for correction as "untimely," citing HAR § 12–47–22(c). HAR § 12–47–22 (February 24, 1994) provides, in pertinent part:

(a) When an initial conference is held, the board may enter a pretrial order which recites the action taken at the conference, including:

. . . .

(2) The issues for hearing not otherwise disposed of by stipulation or agreement of the parties[.]

. . . .

(c) The pretrial order shall control the subsequent course of the appeal, unless modified by the board *at the trial or prior thereto to prevent manifest injustice.* The pretrial order shall supersede the pleadings where there is any conflict and shall supplement the pleadings in all other respects.

(Emphasis supplied.)

On February 12, 2003, the Board filed its decision and order affirming the Director's May 14 and May 23, 2001 decisions. The Board concluded, in relevant part:

It is clear from our reading of HRS § 386–41(b) & (c), and HRS § 386–43(b), that the basis for computing dependents' weekly benefits is the deceased employee's AWW [average weekly wages] subject to a statutory maximum and minimum.

. . . .

. . . . Survivors agreed that for the purpose of calculating PTD benefits, the operative date for determining an employee's AWW and its corresponding maximum benefit rate was the date of the work injury or accident.

Since there is no dispute that AWW for the purpose of calculating disability benefits is limited in HRS § 386–31 to the State AWW at the time of the work injury, and since both HRS § 386–41(b) & (c) and HRS § 386–43(b) cite or refer to the limitation prescribed in HRS § 386–31, it follows then that the AWW for the purpose of calculating death

benefits is also limited by the State AWW at the time of the work injury that caused the subsequent death.

. . . .

Accordingly, based on the foregoing, we conclude as follows: (1) the maximum benefit rate used to calculate funeral and burial expenses is based on the rate for the year the injury or accident is sustained; and (2) the aggregate weekly benefits payable for death benefits, pursuant to HRS § 386–43(b), is based on the maximum benefit rate for the year the injury or accident is sustained.

The survivors filed their notice of this appeal on February 27, 2003.

## II. Discussion.

### A. Death Benefits.

HRS § 386–41(a), governing funeral and burial allowances, HRS §§ 386–41(b) and –41(c), governing weekly benefits, and HRS , § 386–43(b), governing aggregate weekly benefits, all cap their respective death benefits by express or implied reference to "the maximum weekly benefit rate prescribed in section 386–31[.]" HRS § 386–41(b); HRS § 386–43(b). There is no other colorable statutory reference. The MWBR prescribed in HRS § 386–31 is, in turn, "the state average weekly wage last determined by the director[.]" HRS § 386–31(a). Because HRS §§ 386–31(a) and –31(b) provide for PTD and TTD benefits, respectively, that is, disability benefits for employees injured on the job, the State average weekly wage referenced therein must perforce be determined as at the date of the employee's injury. Climbing back up the chain of inference, we conclude that the calculation of workers' compensation death benefits must likewise be based upon the date-of-injury MWBR. *Crowley v. City and County of Honolulu, Wastewater Mgmt.,* 100 Hawai'i 16, 17–18, 58 P.3d 74, 75–76 (App.2002) (in construing a statute, "our foremost responsibility is to ascertain and give effect to the intention of the legislature, obtained primarily from the language itself. Further, we must read the statutory language in the context of the entire statute and construe it in a manner consistent with

its purpose" (citation and internal quotation marks omitted)); *Gray v. Admin. Dir. of the Court,* 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (in construing an ambiguous statute, " 'the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning' " (brackets and block quote format omitted) (quoting HRS § 1–15(1) (1993)); HRS § 1–16 (1993) ("Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another.").

### B. Correction of the Pretrial Order.

The survivors urge that the Board's omission of the words "and weekly benefits" from issue a. of the pretrial order was a mere "clerical mistake" amendable as a matter of course under HAR § 12–47–54. We disagree and conclude that HAR § 12–47–22(c) controlled. Under the latter authority, available only "at the trial or prior thereto to prevent manifest injustice[,]" HAR § 12–47–22(c), and considering all of the relevant circumstances, we conclude that the Board did not abuse its discretion in refusing the survivors' application to correct the pretrial order.

### III. Conclusion.

Accordingly, the Board's February 12, 2003 decision and order is affirmed.